UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMIE KENDALL,

                Plaintiff,                         Civil Action No.
                                                    07-CV-15158

vs.

                                                 HON. BERNARD A. FRIEDMAN

URBAN LEAGUE OF FLINT and
VALARIA CONERLY-MOON,

                Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S 42 U.S.C. § 1981 CLAIM and DISMISSING PLAINTIFF'S STATE-LAW CLAIMS WITHOUT PREJUDICE

        This matter is presently before the court on defendants' motion for summary judgment [docket entry 21]. Plaintiff has filed a response brief and defendants have filed a reply. On March 31, 2009, the court heard oral argument. For the following reasons, and for the reasons stated on the record, the court shall grant defendants' motion as to plaintiff's sole federal claim and dismiss the state-law claims without prejudice.

***Background***

        Plaintiff Jamie Kendall, who is biracial, alleges she was not hired as the CEO of the Urban League of Flint ("ULF") because the chairperson of ULF's board of directors, Valaria Conerly-Moon ("Moon") did not believe plaintiff was "black enough" for the job. Plaintiff is suing ULF and Moon under 42 U.S.C. § 1981 and Michigan's Elliott-Larsen Civil Rights Act, Mich.

Comp. Laws § 37.2202 for "failure to promote" her because of her race.[1]  She is also suing both

defendants for slander and for intentional infliction of emotional distress.

Plaintiff worked for ULF from 2004 to 2008 as an accountant and finance manager.

In the summer of 2007, ULF began searching for a new CEO.  Plaintiff applied for the job.  A search

committee sorted through the applications and identified four candidates for closer consideration.

These four applications were sent for review to the National Urban League, which certified three

of them as being qualified:  plaintiff, Lorna Latham, and Patrick McNeal.  The ULF's board of

directors met on October 16, 2007, to interview these three finalists.  At the conclusion of the

meeting, a vote was taken.  There were six votes for plaintiff, eight votes for Latham, and no votes

for McNeal.[2]  The position was offered to Latham.

---

[1] Although pled as such, this is not a "failure to promote" case.  Plaintiff worked as an accountant, assisting the CEO.  She was not entitled to be "promoted" to the CEO position after spending a certain amount of time as an ULF employee or by passing a qualifying test.  The CEO position was a completely different job, which was filled after applications were solicited publicly.  From her response to defendants' motion, and from her oral argument at the hearing on the motion, it appears plaintiff acknowledges that defendants failed to *hire* her, not that they failed to *promote* her, when she was not awarded the job.

[2] Of the 14 votes, ten were cast by board members who personally attended the meeting.  The other four votes were cast "absentee" in writing by board members who did not personally attend.  In her response brief, plaintiff claims the vote was actually six votes for her and seven for Latham.  She bases this on deposition testimony from two board members, Dwayne Parker and Gloria Scruggs, who indicated they believed the final vote was six to seven in Latham's favor.  *See* Parker dep. at 19 (pltf's Ex. 20); Scruggs dep. at 74 (pltf's Ex. 1).  This testimony is clearly mistaken.  The minutes of the board meeting state that ten board members attended in person, that four other board members voted absentee, and that the final vote was six to eight in favor of Latham.  *See* dfts' Ex. 36.  The deposition testimony and affidavits from the board members prove that, as the minutes indicate, 14 board members voted – six for plaintiff and eight for Latham – in the manner indicated below**.**  Parker's and Scruggs' contrary testimony is simply a case of faulty recollection and does not, as plaintiff argues in her response brief, show the existence of a factual dispute that must be resolved by a jury.  At oral argument, plaintiff conceded that the board in fact cast six votes for her and eight for Latham.

2

Plaintiff bases her race discrimination claims primarily on her belief that Moon, the board chairperson, did not like her and engineered her defeat. When plaintiff heard the ULF would soon be looking for a new CEO, she arranged to have lunch with Moon in May 2007 to discuss her interest in the position. At this meeting, according to plaintiff, Moon made some comments that seemed to question plaintiff's racial qualifications for the job. Since this conversation is at the heart of plaintiff's case, plaintiff's deposition testimony about it is quoted here at length:

Q. What did she say that she thought had happened to the agency under Mr. Newman's [the current CEO's] tenure?

A. She felt that it had not prospered as it should have, and that he had not done a good job of managing the agency.

Q. What did you say in response, if anything?

A. I told her that I had worked closely with Mr. Newman, that I had considered him a mentor, to which she responded that – she suggested I get another mentor other than he if I wanted to be successful.
    And then she went on to say that being the Board Chair, she often has to ask the tough questions, and I seemed to quote Mr. Newman a lot and mention him a lot. She didn't think that was good, given that I was a younger woman, and he being an older man, she said one cannot help but assume something else must be going on and that we had an inappropriate relationship outside of the workplace.

Q. Were those her exact words, "an inappropriate relationship outside the workplace"?

A. Her exact words were she could not help but assume something else must be going on.

\* \* \*

Q. What did you say?

A. I told her that it was absolutely not true; . . .

\* \* \*

3

Q. Anything else, any other conversation at the lunch?

A. Yes, she asked about my background.

*   *   *

A. . . . So she asked about my educational background, then about my parents, what my maiden name was. I told her Johnson. She asked who my dad was. I told her what his name was. She asked me if she knew him. I told her he passed away when I was a toddler. Then she asked what was my mom's name and if she knew my mom, if my mom grew up in the same neighborhood they grew up in.

Q. As?

A. As my in-laws and Mrs. Moon. They know each other from a particular neighborhood in Flint. So she asked, "Well, did your mom grow up there?" And I said no. She asked me what school my mom attended, and I told her Flint Central. And then she asked me her name again. I said "Robecca Johnson. Cook was her maiden name." She says, "Well, do I know your mom?" And I said, "Well, my mom is white." And she said, "Really?"

   She was shocked. She kind of went back in her seat, raised her eyebrow. And then she said, "So are you biracial?" And I said, "Yes." And she said, "I didn't realize that your mom was white." And I told her I really didn't think it was anything relevant to share, but since she was trying to place my mom, that would be a pertinent piece of information in order to figure out if she knew her or not in trying to describe her to her.

*   *   *

Q. So what else?

A. Then she went on to ask me how did I identify myself as an individual, and I told her as an African-American, as a black woman. And then she asked what made me identify myself as a black woman. And I said, "Well, it was just the way that I was raised and just how I was brought up."

   And she said, "But what makes you think that you're black?" And I said, "Well, it's who I see when I look in the mirror every day. It's how I was raised. It's the environment in which I grew up. I just am a black person."

   And then she asked me again, "But what makes you think that

4

you're black?" And I paused, and I remember I put my hands in my lap. I was a little bit shaken. And I just – I just told her, "I don't know." I said, "I don't know if I'm not answering the question the way that you had anticipated that I answer it, because you keep asking me the same question," I said, "but – so I guess I just – maybe I just don't understand the question." I said, "But it's just the way that I am."

And she said, "Well, do you think that you could identify with black people?" And I said, "Yes, I do think that I can identify with black people." And she asked me if I felt I could run an agency such as the Urban League, given its importance to her that the individual in that position identify with black people.

And I told her, "In my opinion, my race shouldn't matter in performing my duties as the CEO, I said, because one of the main goals of the Urban League is to eradicate poverty." And I said, "Poverty has no color, and I don't think my background or my race would play a part in me performing my role."

Q. And how did she respond to that? Did she respond?

A. She raised one eyebrow and just said, "Okay. Well, I'm just going to tell you that we're not going to take Mr. Newman's recommendation for a CEO, President/CEO, that we will be conducting a national search, and I'm –" this is me speaking as her, she just said, "You know, I'm going to be honest with you, I don't think you have what it takes to run an agency like the Urban League. So you might want to consider another career plan or career path."

Pltf's dep. at 159-64. On cross-examination, plaintiff was asked why she believed that Moon influenced other board members to vote against her. Her response included this statement: "The comments that she made to me when we met on May 16th relative to my relationship with Mr. Newman being more than professional, . . . her questioning whether or not I felt I was black enough to run the agency." *Id.* at 215. Thus, it appears that "whether or not I felt I was black enough to run the agency" is plaintiff's interpretation of Moon's questions about "what makes you think that

you're black" and whether plaintiff "could identify with black people."[3]

Plaintiff also alleges that Moon made some racist comments at other times in other contexts. For example, in October 2006 Moon allegedly said to the CEO, Paul Newman, "Why do we have to have a white attorney?" The same month, Moon allegedly said to Newman, while referring to a former CEO, who is white, "We don't need a white person chairing this board anyway." In April or May 2007, Moon allegedly told Newman she did not "need to ask that white girl anything," when he suggested she contact the former CEO for information on an issue. *See* Newman Affidavit ¶ 23 (pltf's Ex. 12). These comments, combined with the lunch conversation in May 2007, is plaintiff's evidence that Moon harbored racial animus against her.[4]

Plaintiff's slander claim is based on a telephone conversation in January 2007 during which Moon allegedly told another board member (Gerald Matthews) that plaintiff was dishonest and that plaintiff was having an affair with Newman. Newman has testified that two other board members (Parker and Scruggs) told him that Moon repeated this accusation during one or more "executive committee" meetings. Pltf's Ex. 2, p. 139.

---

[3] Moon testified that she did not ask plaintiff if she was "black enough" for the job; that she knew plaintiff was biracial but did not view race as an issue in the hiring process; that she did not believe plaintiff was ready for the job; and that she did not question plaintiff about her relationship with Newman. Pltf's Ex. 13, pp. 80-82, 84-85. On summary judgment, plaintiff's version of the conversation must be accepted as true.

[4] Plaintiff makes additional allegations in an effort to show that Moon (but not other board members) treated her unfairly during the application process. For example, plaintiff alleges Moon "glared" at her and would "cross her arms" when plaintiff was present; that during the pre-selection process Moon asked plaintiff questions which were not asked of the other candidates; and that Moon gave plaintiff a "shockingly low score of 105 while giving Lorna Latham . . . a perfect 700." Pltf's Resp. Br. at 6-7. While this may be evidence of Moon's animosity toward plaintiff, it is not evidence of race discrimination – and it certainly is not evidence that the decision-maker in this case, i.e., the board of directors, treated plaintiff unfairly or in a discriminatory fashion.

6

***Defendants' Summary Judgment Motion***

Defendants argue they are entitled to summary judgment on plaintiff's race discrimination claims because plaintiff has no evidence that her race or color played a role in the board's decision to hire Latham instead of plaintiff.  In response, plaintiff argues that sufficient evidence to defeat defendants' motion can be found in Moon's comments, deposition testimony of two pro-Latham board members that being African-American would be a "plus factor" for a CEO candidate, Moon's decision to allow absentee voting, and the board's selection of Latham despite plaintiff's allegedly superior qualifications.

### A. *Legal Standards*

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  Viewing the evidence in the light most favorable to the opposing party, summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party.  *See Anderson,* 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989).  In other words, "[a] material issue of fact exists where

7

a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990).

The analysis of race discrimination claims under § 1981 is the same as under Title VII. *See Young v. Sabbatine*, 2000 WL 1888672, at *4 (6th Cir. Dec. 19, 2004). As this is a "failure-to-hire" case, plaintiff makes out a prima facie case by showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If plaintiff states a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for their hiring decision. *See id.* Plaintiff must then attempt to show that this reason is a pretext for discrimination, which she may do "(1) by showing that the stated reasons had no basis in fact, (2) by showing that they were not the actual reasons, and (3) by showing that they were insufficient to explain the discharge." *Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991). However, plaintiff must not only show that the stated reason is either untrue or insufficient: "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). Ultimately, the issue is whether plaintiff has evidence that defendants' decision not to hire her was motivated at least in part by race and, if so, whether the evidence is sufficient for the matter to be resolved by a jury. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008).

8

The present case has an additional complicating aspect in that the main alleged discriminator, Moon, had no independent hiring authority. The decision to hire Latham instead of plaintiff was not made by Moon, but by the entire board of directors. It is true that Moon had a vote, but 13 other board members did as well. Thus, a threshold legal issue is the manner in which Moon's alleged racism must be weighed in the context of the board's hiring decision.

The parties cite several instructive cases in which the issue was whether discriminatory comments or actions by a person associated with the ultimate decision-maker may be attributed to the decision-maker itself. In *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715 (6th Cir. 2004), cited by defendants, plaintiff was a black restaurant worker who alleged he was discharged because of his race. Evidence showed that a manager (Lawrence) had treated plaintiff unfairly because of his race in various ways. Lawrence was transferred and replaced by a different manager (Ficorilli). Three months later, Ficorilli fired plaintiff when he failed to come to work. There was no evidence that Ficorilli had treated plaintiff unfairly prior to the discharge decision. In discussing whether Lawrence's racial bias could be imputed to Ficorilli, the Sixth Circuit stated:

> We must consider, therefore, whether Noble presented sufficient evidence to impute Lawrence's alleged racial animus to Ficorilli. *See, e.g., Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 876 (6th Cir.2001); *Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir.1992). Although we usually encounter the issue of imputation in the context of imputing the comments or actions of a subordinate to a manager or other decisionmaker, *see, e.g., Christian*, 252 F.3d 862; *Wilson*, 952 F.2d 942, the same principles apply here, where Noble seeks to impute the alleged animus of one manager, Lawrence, to a succeeding manager, Ficorilli. In cases of this type, "[t]he determinative question is whether [the plaintiff] has submitted evidence that [a particular employee's] racial animus was a cause of the termination." *Wilson*, 952 F.2d at 946. In other words, **a plaintiff must submit competent evidence that one employee's "discriminatory motives somehow influenced" the decisionmaker**. *Id.*

391 F.3d at 723 (emphasis added).

9

In a similar case, *Clack v. Rock-Tenn Co.*, 2008 WL 5378026 (6th Cir. Dec. 22, 2008), cited by defendants, plaintiff was a black factory worker who alleged he was discharged because of his race. Evidence showed that his supervisor (Murphy) had made racist comments and had treated plaintiff differently because of his race. Plaintiff was fired by defendant's general manager (Lancaster) when plaintiff was insubordinate with Murphy. On appeal an issue was whether Murphy's comments about and treatment of plaintiff could be imputed to Lancaster. The court stated:

> Lancaster's testimony regarding his reasoning for the termination indicates that Lancaster engaged in an **independent investigation** and made a decision based on that investigation. A number of cases from this court suggest that this is enough to sterilize the termination from the taint of Murphy's racial animus. In *Wilson v. Stroh Companies, Inc.*, 952 F.2d 942, 946 (6th Cir.1992), for example, we held that a direct supervisor's racial animus could not be imputed to a manager who made the ultimate termination decision when the supervisor reported the incident in question but the termination decision was based on management's **independent investigation**.

2008 WL 5378026 at *6 (emphasis added).

In *Wells v. The New Cherokee Corp.*, 58 F.3d 233 (6th Cir. 1995), cited by plaintiff (and by the court in *Noble*), the issue was whether age-based comments by plaintiff's direct supervisor (Sharp) could be imputed to the plant controller (Merritt) who discharged plaintiff. The court stated:

> Sharp was involved in the decision to fire her. The testimony was convincing that Sharp and Merritt worked closely together and consulted with each other on personnel decisions. Sharp and Merritt themselves testified that they acted jointly. Sharp explained that "*We* were removing her for job performance," and Merritt stated that "*We* decided that . . . she could not stay on the switchboard." (Emphasis added.) Sharp, not Merritt, prepared and signed the termination report. Whatever the formal hierarchy of New Cherokee might be, plainly Sharp contributed significantly to the decision, so his

10

motivations are relevant to the question whether Wells was fired
because of her age.

*Wells*, 58 F.3d at 237-38.

In *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir. 1990), cited by plaintiff (and cited

with approval in *Noble*), plaintiff alleged defendant discharged him because of his age.   The

discharge decision was made by Upjohn's "career path committee," which reviewed plaintiff at the

recommendation of plaintiff's supervisor (Lehnst).   There was evidence that Lehnst, in performance

evaluations and job assignments, had discriminated against plaintiff based on his age.   In discussing

whether Lehnst's discriminatory comments and conduct could be imputed to the committee, the

court stated:

> Lehnst did not fire Shager; the Career Path Committee did. If it did
> so for reasons untainted by any prejudice of Lehnst's against older
> workers, the causal link between that prejudice and Shager's
> discharge is severed, and Shager cannot maintain this suit even if
> [Upjohn] is fully liable for Lehnst's wrongdoing. But if Shager's
> evidence is believed, as in the present posture of the case it must be,
> the committee's decision to fire him was tainted by Lehnst's
> prejudice. Lehnst not only set up Shager to fail by assigning him an
> unpromising territory but influenced the committee's deliberations by
> portraying Shager's performance to the committee in the worst
> possible light. Lehnst's influence may well have been decisive. The
> committee's deliberations on the question whether to fire Shager
> were brief, perhaps perfunctory; no member who was deposed could
> remember having considered the issue. A committee of this sort, even
> if it is not just a liability shield invented by lawyers, is apt to defer to
> the judgment of the man on the spot. Lehnst was the district manager;
> he presented plausible evidence that one of his sales representatives
> should be discharged; the committee was not conversant with the
> possible age animus that may have motivated Lehnst's
> recommendation. If it acted as the conduit of Lehnst's prejudice – his
> cat's-paw – the innocence of its members would not spare the
> company from liability.

913 F.2d at 405.

Plaintiff also quotes extensively from *Ercegovich v. Goodyear Tire & Rubber Co.*,

11

154 F.3d 344 (6th Cir. 1998). In that case, plaintiff's position was eliminated by two mid-level

managers (Evert and Lauritzen). The district judge ruled that age-based comments by a vice-

president (Gallagher) to whom Evert and Lauritzen reported could not be introduced in evidence.

In reversing, the court of appeals stated:

> [T]he discriminatory remarks of those who may have influenced the decision not to reassign the plaintiff to other positions in the company may be relevant when the plaintiff challenges the motive behind that decision.
>
> We must therefore determine whether a reasonable jury could conclude that Gallagher was in a position to influence the alleged decision to deny Ercegovich the possibility of transferring to available positions within the company. When asked whether Gallagher reviewed the decision to eliminate Ercegovich's position, Lauritzen stated that Gallagher "was involved in some parts of the discussion." J.A. at 700 (Lauritzen Dep. at 59). Moreover, we note that Gallagher, as head of the entire Retail Sales Division, was in a position to shape the attitudes, policies, and decisions of the division's managers, including Evert and Lauritzen. *See Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 632 (7th Cir.1996) (biased remarks corroborate plaintiff's discrimination claim where remarks were made by "top policymakers in the company . . . who [we]re ultimately responsible for the company's employment practices"); *Tuck v. Henkel Corp.*, 973 F.2d 371, 376-77 (4th Cir.1992) (biased statements of head of corporation's R & D Group were probative evidence of age discrimination against plaintiff where speaker may have influenced actual decisionmakers), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993). "When a major company executive speaks, 'everybody listens' in the corporate hierarchy." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 546 (3d Cir.1992) (quoting *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir.1989)), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). Therefore, we conclude that a genuine issue of fact exists as to whether Gallagher was involved in the employment decisions adverse to Ercegovich, and we must assume for purposes of summary judgment that Gallagher did in fact play a meaningful role in those decisions. Gallagher's statements thus cannot be excluded under the *McDonald* rule, and the district court erred in concluding otherwise.

154 F.3d at 355. As in the other cases of this type, the comments at issue were deemed to be

relevant because of the speaker's influence on the allegedly discriminatory decision.

In a case more analogous to the present case, *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250 (6th Cir. 2006), cited by plaintiff, the plaintiff applied for the position of school director. The school board interviewed plaintiff but selected another candidate for the job. Plaintiff alleged the board voted against him because of a newspaper article that reported he had agreed to speak at a gay church convention. He sued the board, and some board members, under § 1983 for violating his rights of freedom of speech and freedom of association. On appeal, one of the issues was the potential liability of the board, as distinguished from that of individual board members. The court stated:

> Circuits are split on how to determine if a board, rather than its members, acts with improper motive. The Second, Third, and Ninth Circuits have implied that **a board is liable for actions that it would not have taken "but for" members acting with improper motive**. *See LaVerdure v. County of Montgomery*, 324 F.3d 123, 125 (3d Cir.2003) (no municipal liability because board voted unanimously and only one member had improper motive); *Jeffries v. Harleston*, 52 F.3d 9, 14 (2d Cir.1995) ("[T]he nine votes based on legitimate grounds constitute a superseding cause breaking the causal chain between the tainted motives . . . and the decision"); *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir.1994) (no municipal liability because board acted unanimously and only one member had improper motive). **Thus, where improperly motivated members supply the deciding margin, the board itself is liable.**
>
> *   *   *
>
> The "but for" approach from the Second, Third and Ninth Circuit cases is more in accord with the decision from *Mt. Healthy*. In that case, the Court set up a burden-shifting regime in which a key question was whether a board would have acted the same way, absent improper motive.
>
> Applying the "but for" approach here, Scarbrough has submitted enough evidence to hold the Board itself liable. He has submitted evidence showing Lively, Strand and Spurling voted with improper motivation. The Board would not have taken the action it

13

did were it not for their votes. Thus, the Board is not entitled to
summary judgment on this issue.

470 F.3d at 262-63 (emphasis added).

In *Jeffries v. Harleston*, 52 F.3d 9 (2d Cir.1995), cited in *Scarbrough*, plaintiff was

a public college professor who gave a controversial speech off campus. Shortly thereafter, the 14-

member college board of trustees voted to reduce plaintiff's term as the chairman of his department.

Plaintiff sued the board and its members under § 1983 for retaliating against him for exercising his

First Amendment rights. The jury found that three board members voted against plaintiff to punish

him for his speech, and that nine board members voted against plaintiff but had no retaliatory

motive. (Of the other two board members, one abstained and the other died during the trial.) The

court of appeals held that under these circumstances, *all* of the defendants (the individuals as well

as the board itself) were entitled to judgment as a matter of law:

> [E]lementary principles of causation compel the conclusion that
> Jeffries' First Amendment rights were not violated. *See* 42 U.S.C. §
> 1983 (section 1983 relief only available if the plaintiff was deprived
> of federal rights). The jury found that at least nine of the defendants,
> a clear majority, limited Jeffries' term because they expected his
> speech would harm CUNY (and not for invidious motives), and that
> this expectation was reasonable.
>
> **There is, moreover, no reasonable possibility that the six
> Harleston defendants tainted the vote with whatever retaliatory
> motives they may have had**. Three of the six Harleston defendants
> voted against the proposal to limit Jeffries' term to one year; two of
> them were not Trustees, and thus could not vote; and one abstained.
> While Harleston and Reynolds were instrumental in putting the
> one-term issue on the Board's agenda, . . . and may indeed have done
> so to punish Jeffries, **the nine votes based on legitimate grounds
> constitute a superseding cause breaking the causal chain between
> the tainted motives (of Harleston and Reynolds) and the decision
> to limit Jeffries' term**. *See Gutierrez-Rodriguez v. Cartagena*, 882
> F.2d 553, 561 (1st Cir.1989) (superseding causes relieve defendants
> of section 1983 liability). And, to whatever extent any of the
> Harleston defendants inveighed against Jeffries and his speech at the

14

> Board meetings, the jury expressly found that these lamentations did not affect the nine Trustee defendants who based their votes on a reasonable expectation of harm. Thus, the motives of the Harleston defendants – whatever they were – did not cause a cognizable injury to Jeffries.

52 F.3d at 14 (emphasis added).

### B. *Discussion*

#### 1. *Moon's Influence*

From these cases, it is clear that plaintiff cannot prove her discrimination claims simply by pointing to Moon's questionable comments (i.e., "what makes you think that you're black?"; "do you think that you could identify with black people?"; and "[are you] black enough to run the agency?").  Rather, even assuming these comments are indicative of race discrimination, plaintiff must show that Moon influenced the board's vote.  In the two most analogous cases discussed above, where employment decisions were made by a multi-member board, the test was articulated as whether "improperly motivated members suppl[ied] the deciding margin," *Scarbrough*, 470 F.3d at 262, or whether the votes against plaintiff were "tainted [by] whatever retaliatory motives [other board members] may have had." *Jeffries*, 52 F.3d at 14.

In the present case, plaintiff has produced no evidence suggesting that Moon had any such influence on the other board members.  Every board member has been deposed, and all have testified that they cast their votes independently based on their own consideration of the candidates' qualifications.  In the end, the evidence shows only that *Moon* may have had a discriminatory motive, but not that the *decision-maker* (i.e., the board of directors) had any such motive.

The minutes of the October 16, 2007, board meeting (dfts' Ex. 36) show that ten

15

members were present.  Four other board members were not present, but they submitted votes in writing.  From the deposition testimony and affidavits, it is established that these 14 board members voted as follows:

| **For Plaintiff Jamie Kendall (6)** | **For Lorna Latham (8)** |
| --- | --- |
| James Richardson | Valaria Conerly-Moon |
| Gloria Scruggs | Hector Garcia |
| Dwayne Parker | Rhoda Matthews |
| Vera Perry | John Frederick |
| Gerald Matthews | Danielle Brown (absentee) |
| Eleazar Barzart (left early, voted in writing) | Corinne Edwards (absentee) |
| | Charlotte Edwards (absentee) |
| | Shannon Polk (absentee) |

In order for Moon's comments to be imputed to the board, plaintiff must show that Moon, and whichever board member(s) she may have influenced, provided the "deciding margin" in selecting Latham.  Since plaintiff lost by a vote of six to eight, plaintiff must show that Moon influenced at least one board member to vote for Latham, as the "deciding margin" in this case was two votes – Moon's and one other.

Evidence of influence simply does not exist on this record.  Examining the board members in the Latham column one at a time, Hector Garcia testified that no one attempted to sway his vote and that "I consider myself an independent thinker."  Garcia dep. at 46 (dfts' Ex. 8).  He voted for Latham because "I felt we needed a person that was pro advocacy, very much into, you

16

know, dealing with the community." *Id.* at 65.  In fact, Garcia testified that he never spoke to Moon about Kendall outside of board meetings, and that he never heard Moon make any comments about Kendall during any board meetings.  *Id.* at 41-42.

Rhoda Matthews testified that she had a telephone conversation with Moon sometime in the spring of 2007 and that Moon "didn't feel that [Kendall] was ready for the responsibility" of being CEO.  R. Matthews dep. at 9 (dfts' Ex. 11).  In an affidavit, Rhoda Matthews says that she

> cast my vote for Latham because of her experience as a director of a non-profit organization and her experience in fundraising.  She also has a stellar reputation in the community.  Latham also provided thorough and in-depth interview responses, which I found impressive.  In addition, Latham had a passion for the ULF, which was an asset for the CEO.  I believe that Latham met all of the qualifications for the CEO position and was the most qualified candidate for the position.

Dfts' Ex. T.

John Frederick testified that he had never heard that Moon thought plaintiff was "not black enough" for the job or that Moon thought plaintiff was having an affair with Newman. Frederick dep. at 16 (dfts' Ex. 7). Nor had Frederick ever heard any rumors about the affair.  He voted for Latham because "she was the most qualified person for the position. . . . She had done grant writing.  She worked with the community. . . . And the way she presented herself how she could best serve the purpose of CEO for the Urban League." *Id.* at 25.  Frederick said he did not speak with anyone, including Moon, about the candidates or about the upcoming vote before the board voted.  *Id.* at 26-27.  The only comments he could remember Moon ever making about plaintiff were positive (e.g., "she brought up that Jamie was the part-time accountant for the organization, and she was going a yeoman's job").  *Id.* at 13.

Danielle Brown, who voted absentee, testified that she voted for Latham because

17

> [t]his organization, for it to . . . function the way that it should, really
> needs a person who has a strong, or has a programming experience.
> I'm talking about development programs, writing . . . grants,
> maintaining grants for programming, someone who is pretty much on
> their feet in that area. And based upon what I saw, Ms. Kendall was
> very skilled as it related to the accounting components of that. But
> there was nothing that I ever saw that made it seem as if she would
> be . . . the best candidate for what the organization needed
> immediately, which was programming and services.

Brown dep. at 27-28 (dfts' Ex. 3).  Brown also testified that she had heard the rumor, from another

board member but she did not remember which one, that plaintiff and Newman were having "an

inappropriate relationship," but Brown thought the rumor was "ugly" and she did not believe it.  *Id.*

at 14-15.  Brown had never heard about Moon's "not black enough" conversation with plaintiff and

did not hear anyone raise plaintiff's race in any context.  *Id.* at 18-19.  Brown also testified that no

one ever contacted her about the CEO selection prior to the final board meeting.  *Id.* at 20-21.

Finally, Brown testified that she never was contacted by Moon and that she never heard Moon make

any negative comments about plaintiff during board meetings.  *Id.* at 12.

 Corinne Edwards, who also voted absentee, testified that she had never heard

anything about the May 2007 meeting between plaintiff and Moon, and that she had never heard

anything about an affair between plaintiff and Newman.  Edwards dep. at 14-15 (dfts' Ex. 6).

Edwards also testified that she did not have any discussions with other board members about

opinions concerning the candidates except during one board meeting when the decision was made

as to which candidates to refer to the NUL for certification.  *Id.* at 32-33.  In an affidavit, Edwards

states that she voted for Latham

> because of her experience in grant writing and fundraising.  Latham
> also showed great wisdom and maturity, which were valuable assets
> for the CEO.  I believe that Latham met all of the qualifications for
> the CEO position and was the most qualified candidate for the

position.

Dfts' Ex. 39.

Charlotte Edwards, who also voted absentee, states in her affidavit that she voted for Latham "because of her experience as an executive of a non-profit organization and her demonstrated success in obtaining grants. I believe that Latham met all of the qualifications for the CEO position and was the most qualified candidate for the position." Dfts' Ex. 37. At her deposition Edwards testified that she never heard Moon make any negative comments about plaintiff at board meetings; that she had never heard anything about the "not black enough" conversation; that she had heard rumors about the affair, but not from Moon or another board member; and that she never discussed plaintiff's race or skin color with Moon. Edwards dep. at 20-21, 23, 25 (pltf's Ex. 5).

Finally, Shannon Polk, who also voted absentee, testified that she never had any discussions about plaintiff's race or about her being biracial; that she had heard rumors about the affair, but not from anyone associated with ULF, and she does not "put a lot of stock in rumors"; and that the only time she recalled talking about plaintiff with Moon was when she called Moon (not vice versa) to urge Moon to vote for Latham because, in Polk's view, plaintiff was not the best candidate. Polk dep. at 11-13 (dfts' Ex. 14). Polk said she voted for Latham because she was "the candidate that had the strongest programming [background] . . . as well as having a really good relationship with the major funders." *Id.* at 16-17.

In short, plaintiff has produced no evidence that any of the board members who voted

for Latham were influenced in any way by Moon.[5]  The testimony from all of the board members

who voted for Latham is that they were not influenced by Moon and that they voted for Latham

because she was the best candidate.  In fact, all but one of the board members who voted for Latham

have testified that they had no contact with Moon regarding plaintiff.  Only one board member who

voted for Latham, Rhoda Matthews, testified that she had any such contact, and it was a single

telephone conversation in the spring of 2007, months before the vote.  Matthews' testimony is that

Moon simply indicated she "didn't feel that [Jamie Kendall] was ready for the responsibility." Dfts'

Ex. 11, p. 9.  In her affidavit, Matthews avers she voted for Latham because she was the most

qualified candidate for the job.  *See* dfts' Ex. 38.

---

[5] In this connection plaintiff mentions two telephone conversations Moon had with Gerald Matthews, one of the board members who voted for plaintiff.  According to Matthews, Moon called him in January or February 2007, shortly after he joined the board, and said that plaintiff was incompetent and that she was having an affair with Newman.  In August or September 2007, Moon called Matthews again and said she did not like plaintiff and would resign as chairperson if plaintiff became CEO.  Since Matthews voted *for* plaintiff, these conversations are irrelevant.  Similarly, plaintiff asserts at page 7 of her response brief that "Moon contacted members actively advocating for Plaintiff's opponent," but her only citation to the record in support of this statement is deposition testimony from board member Eleazar Barzart (pltf's Ex. 17, pp. 15-16) who testified that Moon telephoned Barzart and said she was voting for Latham.  However, this lobbying effort was unsuccessful, as Barzart voted *for* plaintiff.  For plaintiff to prevail, she must show that Moon influenced at least one board member to vote *against* her (i.e., for Latham).

Plaintiff also seems to think it relevant that Matthews resigned when the results of the voting were announced.  According to the minutes of that meeting, "G. Matthews responded to the outcome of the vote by submitting his immediate resignation.  He said that the Chair was biased and had actively engaged in discrediting one of the candidates.  The Chair denied the accusation."  Dfts' Ex. 36.  In an affidavit, Matthews does not say why he resigned, but he does say he disagreed with Moon's assessment that plaintiff was not "CEO material."  He also says he believes Moon was "hostile" towards plaintiff and had a "clear agenda against" her.  Pltf's Ex. 10.  In an email to all of the board members the day after he resigned, Matthews said Moon had subjected plaintiff to "innuendoes and vicious gossip" and had treated her in a "shabby and poor fashion."  Pltf's Ex. 33.  But he did not suggest Moon's poor treatment of plaintiff, or any board member's vote, had anything to do with plaintiff's race or skin color.

### 2. *Other Evidence of Discrimination*

Nor has plaintiff produced any other evidence that any of the pro-Latham board members voted for Latham for discriminatory reasons. Plaintiff's counsel asked some of the board members during their depositions whether they believed it would be a "plus factor" for a candidate to be African-American. Three (Scruggs, Frederick and Brown) answered affirmatively. As Scruggs voted for plaintiff, her comments on this issue are irrelevant. Frederick was asked: "In assessing the candidates for the CEO position, in your mind, was it a plus factor or a helpful factor for the candidate to be African-American?" Frederick answered: "It would be a plus factor." Pltf's Ex. 22, p. 15. Similarly, Brown was asked: "In your view, in selecting a CEO, was the fact that a candidate was African-American a plus factor, an advantage?" Brown answered: "Yes." Pltf's Ex. 4, p. 17. This testimony is not evidence of race discrimination. Plaintiff views herself as being African-American (as does Latham). The racial difference between plaintiff and Latham is that plaintiff is biracial and allegedly has a lighter skin color than Latham. Plaintiff did not elicit any testimony from pro-Latham board members to the effect that they deem a darker skin color to be a "plus factor," or that being biracial or having a lighter skin color is a "minus factor." Frederick would not agree with plaintiff's counsel that plaintiff was "lighter-complected" than Latham because "I've never even visualized them together." Dfts' Ex. E, p. 21. Brown would not agree that plaintiff was "more light-complected" than Latham because she thought plaintiff and Latham were "both light-complected" and "both black." Dfts' Ex. C, p. 19. No reasonable jury could interpret this testimony as suggesting that Frederick or Brown (or any other board members) voted for Latham, and not for plaintiff, because of the candidates' race or skin color.

Plaintiff also argues that Moon's allowance of absentee voting is evidence of race

21

discrimination because the procedure had never been used before, was not permitted by ULF's

bylaws and, in plaintiff's view, was an irregular procedure allowed by Moon in order to obtain the

votes needed to appoint Latham.  The facts do not lend themselves to this interpretation.  One of the

board members, Charlotte Edwards, testified that a few days before the October 16 meeting she

telephoned Moon and said she would not be able to attend the meeting and would like to vote in

writing.  Edwards dep. at 37-38 (pltf's Ex. 5).  Edwards and Moon consulted the bylaws and

concluded that they were silent as to whether an absent board member could vote in writing.  *Id.* at

42.  Moon testified that sometime later she received a telephone call from another board member,

Shannon Polk, who likewise could not attend the October 16 meeting but wanted to vote.  Moon

dep. at 139-40 (pltf's Ex. 13).  Moon decided to permit absentee voting in writing.  *Id.* at 140.  Polk

then, on her own initiative, sent an email to all board members informing them they could vote

absentee in writing.  *Id.* at 141; dft's Ex. 40.  In the end, four board members voted this way.  They

submitted their written votes to the board secretary, Dwayne Parker, who opened them at the

October 16 meeting.  *Id.* at 154.

In an effort to show that the use of absentee voting was impermissible, plaintiff points

to a letter to the board dated October 23, 2007, from CEO Newman who raised a number of concerns

about the CEO selection process, including the possibility that proxy voting was not permitted under

the bylaws.  *See* pltf's Ex. 18.  Newman also said that he would ask the National Urban League to

"conduct a full investigation into the governance actions and activities of the Urban League of Flint

Board of Directors."  The National Urban League responded briefly by email on November 6, 2007,

stating that "[i]t appears that the [ULF] is violating its governing bylaws with respect to quorums

and proxy voting (allowed for the annual meeting; not regular or special board meetings)."  Pltf's

22

Ex. 23.  However, there is no evidence that "proxy voting" was allowed for unlawful reasons. Rather, the evidence shows that Moon allowed absentee voting at the request of two board members who wanted to vote but were unable to attend the October 16 meeting.  There is no evidence that Moon knew which board members intended to vote in writing, other than the two who had made the request, or which candidate they supported.  Nor is there any evidence that Moon used this procedure to ensure Latham obtained a majority vote.[6]  In short, no reasonable jury could find that Moon's decision to allow absentee voting is evidence of race discrimination.

### 3. *Pretext*

Plaintiff attempts to show pretext by arguing that she was more qualified than Latham for the CEO position and therefore the board did not, in fact, make its selection based on qualifications.  Again, plaintiff cites *Bass, supra,* 256 F.3d at 1108, in which the Eleventh Circuit stated that "[h]iring a less qualified person can support an inference of discriminatory motivation." In *Bass*, however, the defendant fire department promoted a candidate to a training instructor position "who was unqualified under the Division's criteria." *Id.*  This candidate was *objectively* unqualified because it was "obvious on the face of [his] application that he could not meet the mandatory criterion of obtaining a Florida teaching certification within 18 months of being promoted

---

[6] Plaintiff's citation to *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1108 (11th Cir. 2001) ("[a]n employer's violation of its own normal hiring procedure may be evidence of pretext"), is inapposite.  In that case, there was a specific written policy regarding the hiring procedure, relating to the interview process and evaluation of test scores, all of which was disregarded in order to select a candidate who lacked the minimum mandatory qualifications for a training position.  Nothing of the sort happened here.  Plaintiff cannot show that the "normal hiring procedure" was not followed, but only that Moon accommodated the requests of two other board members to permit voting in writing because they could not attend the meeting.

23

and that he lacked the requisite two years of Training Instructor experience." *Id.* at 1107. By contrast, plaintiff and Latham both were certified by the National Urban League as possessing the required qualifications.[7]

Whether plaintiff was more qualified than Latham was a judgment call for the ULF board of directors to make. The decision to hire the leader of an organization depends on many intangible factors which cannot be weighed by outsiders simply by comparing resumes. This is apparent from the affidavits and deposition testimony of the board members who voted for Latham. In explaining their reasons for voting for Latham, they mention, among other things: "pro advocacy," "dealing with the community," "experience as a director of a non-profit," "experience in fundraising," "reputation in the community," "interview responses," "passion for the ULF," "grant writing [experience]," "work[] with the community," "the way she presented herself," experience "maintaining grants for programming," "experience in grant writing and fundraising," "wisdom and maturity," "experience as an executive of a non-profit organization," "demonstrated success in obtaining grants," and "really good relationship with the major funders." Even assuming plaintiff had *objectively* better qualifications than Latham in some areas (e.g., her MBA versus Latham's bachelor's degree), it is impossible for the court to determine whether those qualifications outweigh the board members' *subjective* evaluation of the many intangibles, including such things

---

[7] Despite the NUL's certification, plaintiff contends that Latham did not satisfy the requirement of the job posting, which called for a bachelor's degree "with a specialization in the areas of business administration, urban planning, social work, human resources development, public administration, education, political science or an appropriate related discipline." Whether Latham's bachelor's degree in "mass communication," *see* pltf's Ex. 29, satisfied this requirement was for the NUL and the ULF to determine. Certainly, this is a far cry from the circumstances in *Bass* where plaintiff possessed the required qualifications and the person who was selected did not.

as the candidates' personalities, reputation, networking abilities, passion, performance at the

interview, and maturity.[8]  Certainly one could imagine a case in which the decision-maker selects

an obviously unqualified candidate, or one who is obviously less qualified than plaintiff.  But this

is not such a case.[9]  Both plaintiff and Latham were certified by the National Urban League as

---

[8] Regarding an employer's discretion to choose from among qualified candidates, the Sixth Circuit stated in *Browning v. Dep't of the Army*, 436 F.3d 692, 696-98 (6th Cir. 2006):

> [T]his court has held that employers are not rigidly bound by the language in a job description. *Wrenn v. Gould*, 808 F.2d 493 (6th Cir.1987). As explained in *Wrenn*, employment-discrimination laws do "not diminish lawful traditional management prerogatives in choosing among qualified candidates," and an employer has "great flexibility in choosing a management-level employee." *Id.* at 502 (holding that an employer can consider factors external to a job description when selecting among qualified candidates) (citation and quotation marks omitted). . . . See also *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1297 n.15 (D.C.Cir.1998), where the D.C. Circuit observed that reasonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions. Obviously, they will take additional credentials into account, if those credentials would prove useful in performing the job.

>                    *    *    *

> Not only has this court afforded great flexibility to employers when selecting management personnel, see *Gould*, 808 F.2d at 502, but it has explicitly held that "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons." *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir.1996) (holding that the employee's subjective belief as to why she was terminated fails to satisfy the summary judgment standard).

[9] Even if the court attempted to assess the candidates' relative objective qualifications, it is not at all clear that plaintiff would come out ahead.  The two resumes are attached to plaintiff's response brief as Exhibits 8 and 29.  Plaintiff's work experience, aside from her work with ULF, was as an accountant for the Genesee Intermediate School District, as a "power

25

"qualified" to be considered for the CEO position by the ULF board.

Finally, plaintiff claims that Latham "lied on her application . . . as well as [on] her resume" about pursuing a degree in public administration. Latham's resume, under the "education" heading, lists "Master of Public Administration - Urban Planning: graduation date Spring 2009." Latham testified that after her final interview with the board she decided not to pursue this degree because she wanted to focus on the CEO position. Latham informed Moon of this – after the October 16 vote but before Latham had been offered the job because her background check had not yet been completed – but apparently Moon did not pass on this information to the other board members. Plaintiff concludes that "Moon's cover-up of Latham's admission that she lied on the application documents is further evidence that Defendants' proffered reason for hiring Latham instead of Plaintiff is pretext." Pltf's Resp. Br. at 18.

The court rejects this argument. First, there was no "lie." Latham submitted her application on August 6, 2007 (pltf's Ex. 29), which is before the fall semester would have begun. She listed "Spring 2009" as the expected graduation date, which means she was not intending to begin the program until the fall of 2007. Second, the fact Moon did not tell other board members that Latham had decided not to enroll is not evidence that the board selected Latham for some reason other than her qualifications. Not only had the board already voted when Moon learned the

---

marketer/energy scheduler" for DTE Energy, and as a "real time trader" for Southern Company Energy Marketing, Inc. By contrast, Latham had work experience that appeared to be much more relevant. At the time she applied for the CEO position with ULF, Latham had been working for over two years as the executive director of Leadership Development in Interethnic Relations - Flint (LDIR). Prior to that, Latham held several "program manager" or "program associate" positions over a 3-1/2 year period within the University of Michigan Flint's Office of Educational Opportunity Initiatives, writing grants and managing staff. From 1997 to 2007 Latham also was involved in several volunteer activities in the community. Plaintiff's resume lists no such community involvement.

information, but no board members indicated they voted for Latham, instead of plaintiff, because of the line on Latham's resume showing she expected to obtain a master's degree in the future.

Plaintiff has failed to show that a factual dispute exists as to whether or not the board's explanation – that it hired Latham because she was the better candidate – is true.  Further, even if a jury agreed with plaintiff that she was the "more qualified" candidate, she has offered no evidence from which a jury could find that "discrimination was the real reason" for the board's selection of Latham.  *Hicks, supra.*

### *Conclusion*

Plaintiff's main direct evidence of race discrimination is that one of the board members, chairperson Valaria Conerly-Moon, made comments suggesting she did not feel plaintiff was "black enough" and could not "identify with black people" because she is biracial.  This is not direct evidence of discrimination because (1) the hiring decision was not made by Moon but by the entire board of directors which selected Latham over plaintiff by a vote of eight to six; and (2) plaintiff has produced no evidence that Moon influenced any other board members to vote for Latham.  The board is liable only if "improperly motivated members suppl[ied] the deciding margin," *Scarbrough*, 470 F.3d at 262, or, expressed another way, if the votes against plaintiff were "tainted [by] whatever retaliatory motives [other board members] may have had." *Jeffries*, 52 F.3d at 14.  Even assuming Moon had an unlawful motive, this cannot be imputed to the board because there is no evidence she influenced the vote of even one board member.

Plaintiff's only other purported direct evidence of discrimination is that two of the

board members who voted for Latham (Frederick and Brown) indicated it would be a "plus factor" for a candidate to be African-American. This is not evidence of discrimination because both plaintiff and Latham are African-American and there is no evidence that Frederick or Brown had a bias in favor of dark, or against light, skin color. In fact, Frederick did not agree that plaintiff was "lighter-complected" than Latham because "I've never even visualized them together"; and Brown thought plaintiff and Latham were "both light-complected" and "both black."

Nor has plaintiff produced any circumstantial evidence of race discrimination or any evidence from which a jury might find that the board's vote was not based on the candidates' qualifications but on their race or color. Plaintiff was not, as she claims, "obviously more qualified" than Latham because both were qualified – as is apparent from the National Urban League's certification of the candidates – and the board was entitled to weigh the candidates' subjective as well as objective qualifications. And, in fact, all of the board members who voted for Latham testified that they did so based on her overall superior qualifications. The fact that four board members voted absentee is not evidence of discrimination. The bylaws are silent on the subject, and the deposition testimony is that this procedure was allowed simply in order to accommodate board members who could not attend the October 16 meeting. Finally, Latham did not "lie" on her resume and application, but even if she misrepresented her educational qualifications, this is not evidence that the board considered plaintiff's race or color in choosing Latham.

As there is no diversity of citizenship in this matter, the court's jurisdiction is based solely on the § 1981 claim. For the reasons discussed above, the court shall grant summary judgment for defendants on this claim. In accordance with *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966), the court shall dismiss plaintiff's remaining claims without prejudice.

*See also Brown v. Cassens Transp. Co.*, 546 F.3d 347, 363 (6th Cir. 2008) ("a federal court should typically decline to exercise pendent jurisdiction over a plaintiff's state-law claims after dismissing the plaintiff"s federal claims"); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims. . . .  Residual jurisdiction should be exercised only in cases where the 'interests of judicial economy and the avoidance of multiplicity of litigation' outweigh our concern over 'needlessly deciding state law issues'").

        For all of the reasons stated above, the court concludes there are no factual disputes for a jury to resolve concerning plaintiff's § 1981 claim.  Accordingly,

        IT IS ORDERED that defendants' motion for summary judgment is granted as to plaintiff's § 1981 claim.

        IT IS FURTHER ORDERED that plaintiff's remaining claims are dismissed without prejudice pursuant to *United Mine Workers of Am. v. Gibbs*.

                            S/Bernard A. Friedman

Dated:  April 3, 2009            BERNARD A. FRIEDMAN
      Detroit, Michigan        SENIOR UNITED STATES DISTRICT JUDGE